## WELCH *v.* THE STATE.

No. 9011.   FEBRUARY 17, 1933.

*James W. Brown* and *William Lowrey Stone,* for plaintiff in error.

*George M. Napier, attorney general, B. T. Castellow, solicitor-general, T. R. Gress, assistant attorney-general,* and *Bond Almand,* contra.

ATKINSON, J. The indictment charged Lawrence Welch with murder for the killing of Luch [Lucy?] Welch by shooting her with a gun and by striking and beating her with a gun and with some instrument of a description unknown to the grand jurors. The uncontradicted evidence showed that the deceased was wife of the defendant and sister of the wife of Shedrick Sheppard, and that the homicide occurred on Monday night after dark at the dwelling of Sheppard, where Lucy, the deceased, intended to spend the night. Sheppard as witness for the State testified, in part, as follows: "Lawrence Welch came to our house . . called outside. I told him to come in, but he said he didn't have time, and he called his wife to the door. . . I said, 'Lucy, open the door.' She unlatched the door, and Lawrence come in, and . · . he had a shotgun under his overalls, and he pulled it out. It was a single-barrel. shotgun, and when he pulled it out from under his overalls, he said to Lucy, 'What kind of word did you send me by Frank?' 'I sent no word,' she said. Then he told her to come on and go home. . . Lucy said she would go home to-morrow. Lawrence said, 'I am going to carry you or your dam dead body with me to-night.' Then Lucy got up from the pallet and came and sat on the bed with me. I told Lawrence not to start any fuss in my house, and Lawrence said that he was not going to start any fuss. I told Lawrence that Lucy was afraid to go home with him, because he had the gun. Lawrence then said he would give me the gun and two shells; but I was afraid to go to him, because he had the gun cocked. Then he went up and grabbed Lucy, and my wife hollered, and Lucy grabbed me and I snatched her away from him. I hollered at Lawrence. He had the gun cocked. And Lawrence shot. Lucy ran to the kitchen door, and when I got there I saw her fall out of the kitchen on her face. She got up and turned and went around the house. When she got to the front of the house I heard the gun go off again. I went to the front, and Lawrence Welch was standing up over Lucy with his gun in his hand. Lucy was lying on the ground, and

he was beating her over the head with the shotgun, and saying, 'I have been telling you this a long time.' I got behind the barn, and when he got through beating her I asked him if he had killed her, and he said, 'Yes [with an oath], I done what I wanted to do.' He then went away with the gun. Lucy Welch did not have any weapon, and was not trying to hurt him in any way. I don't know how long Lucy lived after she fell on the ground, but I went in the house and dressed and came out, and she was still struggling. I then went to a white lady's house to get her to call the sheriff. When I got back home she was dead. . I have two shots that come out of the porch floor. There were six shots in all, and two of them went in her body. All six shots were buckshot. The whole load of the first shot fired went into Lucy Welch's body, and they did not go through; but I have the wadding. The load struck her in the left side. Yes, sir, that is the gun that Lawrence Welch shot that night. It is bent now, but was not bent when he shot it. I did not see it again from the time Lawrence shot it until Mr. Sid Howell, the sheriff, had it. It is a number 12 gauge single-barrel gun with a hammer on it. The buckshot struck her under the right arm and went through her. From the way she fell, she was falling on her knees." On cross-examination the witness testified, in part: "He was about 8 feet from Lucy when he shot the first time. I saw the wound on her after the first shot. It made a hole about as big as your first in her left side. The second shot hit her under the right armpit. He told my wife about ten minutes before he shot that he was not going to hurt Lucy. I found the empty shell on the inside of the house, on the west side. There were two shots fired, but I did not find the other shell."

The sheriff, S. W. Howell, for the State, testified in part: "I saw the body of Lucy Welch at Shedrick Sheppard's house under a little peach-tree, and she was dead when I got there. She was lying on her face, stretched out on the ground. I noticed that her head was beat in on the back of the head. She had been struck on the back of her head and hit hard enough to crack the skull. I saw a shotgun wound under her right arm where a whole load of shot went in. It was made with a shotgun, but I could not tell what size shot. I saw another wound in the right side, according to my recollection, and her entrails were out in front. Shedrick Sheppard told me how it happened. I then went to look for Lawrence

Welch. I tracked him and got to his house about the same time he did. I throwed my lights on him, and he throwed his hands up and said that he wasn't going to run. His gun was standing up against a tree near the porch about three feet from the house. . . He told me the gun was against the tree, and that he wanted to put on his shoes and eat supper. Yes, that is the gun. It was bent then as it is now, and there was a little blood on the barrel of the gun. . . I made no threats or inducements to him to make a statement of the killing. I asked him how it happened, and why was the gun-barrel bent. He said he beat her over the head with it and bent the gun-barrel over her head. He said, 'I went in and Lucy was sitting on the pallet, . . and Shedrick was sitting on the bed, and I asked Lucy to come on and go home, and Lucy said that she was not going, and that she was scared that I had the gun.' He said that he told Shedrick he could have the gun; that Lucy said she was not going, and that Lawrence throwed the gun on her, and she went running over to Shedrick, and he shot. He said that he didn't know whether he hit her or not. He said that he reloaded the gun with a buckshot shell and Shedrick and Emmer and Lucy run out as he reloaded, and as he walked around the corner of the house he shot Lucy again, that she fell, and he walked up over her and beat her over the head with a shotgun. I told Lawrence that he had told me exactly like Shedrick had told me. I asked him why he did it, and he said that he went to bring her home or kill her." The defendant made two statements before the jury. In the first he stated, in part: . "I walked up to the door and hailed, and Shedrick said, 'Who is that?' and Shedrick told me to come in, and I walked in, and she was lying down on a pallet, and Shedrick and his wife was in the bed, and I walked in, and my old lady commenced to fussing at me, and I said, 'I didn't come for any fuss; I am not going to bother you,' and Shedrick said, 'She is scared of you because you have got that gun,' and I said, 'If you believe that I am going to bother you I will give the gun to Shedrick,' and I was holding the gun for him to take, and she said, 'I am not scared of it,' and I had the gun in my left hand, the barrel standing up,' and she jumped up and grabbed the gun, and in the tussle the gun fell on the floor and it fired off, and they all run out, and I went back and got the gun and went on home. I just went there to get my old lady to go home. I didn't have in mind to bother her. I just

went there to try to get her to come back home." In his second statement the defendant said, in part: "When Mr. Howell come to my house . . I said, 'I was fixing to go to look for you,' and he said, 'I am hunting you.' . . I said, 'Wait a few minutes; I haven't eat any supper,' and I went into the kitchen to get my supper, . . and Mr. Howell said, 'I will give you supper at the jail.' Me and him come on out and we walked to where the gun was standing up by a china tree, and he wanted to know how come it bent, and I said, 'I don't know,' and he wanted to know if I had something, and I said, 'No,' and he didn't say any more to me, and we come on to town."

The jury returned a verdict of guilty. The defendant's motion for a new trial, based on the general grounds and on three special grounds, was overruled, and he excepted.

■ The written request to charge: "Involuntary manslaughter shall consist in the killing of a human being without any intention to do so, but in the commission of an unlawful act, or lawful act which might produce such a consequence, in an unlawful manner," was not properly adjusted to the case as presented by the evidence and the prisoner's statement, and its refusal was not erroneous.

■ Manslaughter was not involved in the case, and the judge did not err in refusing a request to charge: "Manslaughter is the unlawful killing of a human creature, without malice, either expressed or implied, and without any mixture of deliberation whatever, which may be voluntary upon a sudden heat of passion, or involuntary in the commission of an unlawful act, or a lawful act without due caution and circumspection."

■ The court charged the jury: "The reasonable doubt of the law does not mean a fanciful or captious [capricious?] doubt, it does not mean a doubt arbitrarily created in the mind of a juror for the purpose of finding an excuse to acquit; but it means a doubt which has some reasonable foundation upon which to rest, it means a doubt of a fair-minded, reasonable man and juror, who is honestly in search after the truth and which doubt grows out of the evidence, want of evidence, or proven circumstances in the case." In connection with this charge the court also instructed the jury in the language of the Code as to the right of the defendant to make a statement before the jury. In view of such additional instruction, the substance of the defendant's statement before the jury,

which contained no denial, explanation, or reference to the second shot, the beating with the gun, or the confession to the sheriff, as shown by the uncontradicted evidence, the foregoing charge was not cause for reversal on the ground, as contended, that it "fails to instruct the jury that a reasonable doubt can arise from the defendant's statement; that such charge negatives the idea that a reasonable doubt can arise from defendant's statement." See *Golatt* v. *State*, 130 *Ga.* 18 (2) (60 S. E. 107), holding: "No question of manslaughter was involved in the case. The evidence showed a case of wilful murder. The statement of the accused was to the effect that the woman's death was caused by an accident not involving criminal responsibility on his part. The accused was convicted of murder. It was therefore not error harmful to him, or requiring a new trial, that the court said to the jury, 'If there is any manslaughter in the case, it is voluntary manslaughter.'" See also *Vaughn* v. *State*, 88 *Ga.* 731 (4) (16 S. E. 64) ; *Jordan* v. *State*, 130 *Ga.* 406 (2) (60 S. E. 1063). A request is made to review and overrule the rulings referred to in the two cases last cited, and in all others preceding and subsequent to those decisions, "in so far as they hold that it is not error to fail to refer to the prisoner's statement when charging upon the doctrine of reasonable doubt." In view of the substance of the prisoner's statement in this case, the principle contended for in this request, if tenable, would not be cause for a reversal. All the Justices do not concur in the view that the former decisions of this court should be overruled.

■ The evidence was sufficient to support the verdict, and there was no error in refusing a new trial.

*Judgment affirmed. All the Justices concur.*