1. It was not ground for new trial that the judge instructed the jury "that the evidence should be so conclusive as to exclude every reasonable doubt."
2. Ground 2, which complains that the judge charged the jury that "The reasonable doubt of the law is one that grows out of the evidence, which arises from want of evidence or grows out of a conflict in the evidence, and leaves a reasonable mind wavering and unsettled, not satisfied from the evidence," did not show error, in view of full instructions with respect to effect to be given to the statement of the defendant. Clements v. State, 140 Ga. 165 (78 S.E. 716); Welch
v. State, 176 Ga. 410 (168 S.E. 256); Allen v. State, 194 Ga. 430 (22 S.E.2d 65).
3. It was not error to instruct the jury that "The defendant, under our law, is permitted by law to make a statement in his own behalf; that statement is not under oath; he is not sworn. You can believe a part and reject a part. You can believe it to the exclusion of the sworn testimony in the case, provided you believe it to be true."
4. The court did not err in his instructions concerning dying declarations.
5. The remaining grounds of the motion are expressly abandoned.
6. The verdict was supported by the evidence.
Judgment affirmed. All the Justicesconcur.
 No. 14128. SEPTEMBER 22, 1942.
Raymond Dowdell was convicted of murder, and was sentenced to be electrocuted. The evidence for the State was to the effect that he stabbed to death Mattie Pearl Thornton, under circumstances which showed neither justification nor any mitigating circumstances. The evidence of one witness was in part as follows: "The first time I saw Raymond, the defendant, was when he *Page 579 
grabbed her around the neck, and I looked back on the side like that, and he had done grabbed her around the neck and cut her in the face, and when he cut her in the face he threw her down. Mattie Pearl's back was turned to him when he came up, she was standing between my sisters and I. He cut her with a knife, but what kind I don't know, because I didn't see it. He cut her on this side of her face, but she didn't fall at that time; he threw her down. She didn't say anything but just hallo for help. He grabbed her around her neck and all on her arm, and in her stomach and back and legs. He cut her in her back, and when she fell she fell on her stomach, and then is when he cut her back. She turned over and halloed for help; she just said, `Help! help!' and people heard a voice halloing `Help! help!' and people began to gather around then. Raymond, the defendant, never uttered a word during the whole time. I don't know exactly how many times he cut her,' cause he cut her so many times. I would say that he cut her right here on her face twice and all around here about three or four times. Then he grabbed her and throwed her down, and he cut her all in the back about four — about six or seven times straight down the back. Then he cut on in the front about five or six times, across the stomach. After he got through cutting her he ran down Fifth Avenue with the knife still in his hand,' cause I saw it then when he was running. I saw him running down Fifth Avenue, but I stopped looking. I didn't know which way he turned. That was in February of 1938, and I haven't seen Mr. Raymond, the defendant, since that time." The defendant fled. The Thornton woman was carried to the hospital where she died.
Another witness testified, in part, as follows: "I didn't see any fighting. I just saw him come up and grab her around the neck and go to working on her. He cut her twice in the face, on the neck, and about four or five times in the back. I don't know how deep they were. I know he cut her in the back, because I was standing near her. I didn't see her later, for people were crowding around and I couldn't see. I'm not guessing about seeing her get cut in the back, I saw it. I swear she got cut in the back. She was kinder on her left side when she got cut in the stomach. I saw that. It was a pretty bad cut. She didn't live not very long, because they carried her to the hospital, and when they got her to *Page 580 
the hospital she lived about three or four minutes, and after that she died. . . This dead woman had no weapon, not that I seen. When I saw his knife he was cutting her. I didn't see the handle of the knife. I just saw her; she was down on the ground. He grabbed her around the neck and started cutting her and threw her down." Testimony of another witness was as follows: "I did not see him when he came up to Mattie Pearl; our face was turned down towards Fourth Avenue, and when I looked around he had done grabbed her. When he came up, Mattie Pearl's back was toward him. I didn't hear Raymond say a word before he cut her. When he first grabbed her and cut her, I run up and told my uncle, and I came right on back, and he was still cutting her. I stood back a distance, far from it, and I didn't count how many times he cut her, but he cut her in her face and he cut her in her back and he cut her in her side and stomach. It was about first dusk dark, but I could see all right, and I could tell who he was, but I couldn't see the knife. He never said one word to her while he was cutting her. I didn't go to the hospital with her. He ran away from the crowd."
As to a conversation at the hospital with Mattie Pearl Thornton, a witness testified: "When I got to the hospital she was in the bed. Her wounds had been dressed, and she was resting on this arm just like this, and her sisters was in there, and I walked up — and I walked up to the back of her, and I stood there a little while. She looked around; she says, `Mamie, is this you?' That is what they call me, Mamie. I says, `Yes.' She says, `Yes, he got me this time.' I says, `You are going to get all right.' I says, `Where is your door-key?' I says, `Did it have any money in it?' She said, `Four dollars.' She says, `Have you got Dorris?' and I pulled the child from the back of me and showed her I had this child. . . I was with her at the hospital when her wounds had been dressed. When I walked in the hospital she was resting this way, on this arm, and I walked up to the back of her, and she kinder cast her eyes around over her shoulder like that, and she said, `Mamie, are you there?' I told her yes. She says, `He got me this time.' I says, `Sugar, did Raymond cut you?' She says, `Yes, he got me this time.' I says, `May be you will get over it.' She says, `No, I am going to die.'. . When I got to the hospital that night about nine o'clock and talked to Mattie, she told *Page 581 
me that she was going to die. From the way she was resting on her arm this way and kinder gaping for breath, I imagine she was in pain, because her wound was all dressed when I got to the hospital. She did carry on a conversation with me. I didn't think she was dying, but she evidently did from what she told me. I don't know whether she was like a lot of people when they get excited and think they are dying when they hurt a little bit. She died the next afternoon at three o'clock."
Another witness testified as follows: "Part of the cutting took place while I was gone to the house for the stockings. When I returned, Raymond, the defendant, was stabbing her. She was lying on the ground. He was on her back, you know, hitting her in the back like that, and she was halloaing, `Help! help! somebody help me,' like that. By the time I got there Raymond was on his way back down the street. I tried to help her to her feet. She was struggling. I saw Raymond, but I did not meet him, because I came from up Fourth Avenue up Seventeenth Street; he ran down Fifth Avenue. He was running when I saw him. When I came back she was saying `Oh, I am dying.' I went across the street to call an ambulance and the police. She did get to the hospital, and I went to the hospital with her. I saw the doctors dress her wounds. I went to the emergency room with her, and was there when he dressed her wounds. I don't remember what doctor it was. She had a slight wound on her face — looked like it was kinder deep, right below the eye; and had a very serious wound in her back — it was real deep, and it seemed to cause her much pain. It was right in the center of her back where it might contact her lung. That, in my opinion, would have been sufficient to have caused her death. It was such a wound as would be inflicted by a knife. She had a wound in her side, and some small ones on her neck that weren't very long but kinda deep. She had two deep wounds in her back, I don't remember whether there were any small ones. I don't remember any on her legs. She was cut around ten times. I talked with her after she got to the hospital. I was there when Lula Austin was in there, and I heard the conversation between her and my mother. When I got to her she said, `I am dying,' and when the doctor asked her to turn on her back so he would dress the wounds in front she said, `I can't turn on my back, I will die.' She said Raymond killed her, but she did not say why." *Page 582 
In his statement to the jury, in relating a conversation with her, the defendant said: "I asked her about splitting some of the money with me. Me and her walked on to the store, and I went in and got a coca-cola and tried to get her to get one, and she said no, she didn't want one, and me and Johnnie Rose was talking. She says, `I ain't going to give you no money to give them bitches,' and that time I reached at her and when I reached at her she shoved me back and went in her pocket-book and got a knife, a small knife, and she cut me right there, and right here, and when I grabbed her she cut me right here. There is the scar. . . Me and her was tustling. The first lick was right here. When I shoved her back and caught the knife and me and her fell. . . Me and her was tustling and wrestling. I was holding her knife, and she was holding mine. When the police come they put her in the car, and I was standing at the Metropolitan Church in the dark, and I didn't leave till the next day afternoon. I heard she was dead, and a friend of mine told me, and I left that Wednesday afternoon, and I stayed away until they come up to New York and got me. I was arrested and held for the grand jury."
On the subject of dying declarations, the court charged the jury as follows: "The State insists in this case, gentlemen, that the deceased, before she died, made what is known as a dying declaration. That is an exception to the law against hearsay — dying declaration. It is supposed to be from the necessity of the case, and it is made when the party is in extremis, that is, when they are in a dying condition; then, gentlemen, they are admissible, and that is the exception to the hearsay rule of evidence. I charge you, gentlemen, that you are instructed that it is for the court in the first instance to determine whether the preliminary proof is sufficient to admit dying declarations, but this rule is not binding on you; for you must be satisfied beyond a reasonable doubt that such statement was actually made by the deceased, and that he was or that she was in the article of death, and conscious of her condition, at the time of making such declaration. The rule of law upon that subject is this: Dying declarations made by any person in the article of death, who is conscious of his or her condition, as to the cause of his or her death and the person who killed him or her, are admissible in evidence in a prosecution of homicide. Great caution is necessary in the admission and use of this kind of testimony." *Page 583 
Error was assigned on the refusal to grant a new trial.